AO 91 (Rev. 11/82)

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>PEDRO CORTES | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br>19MJ02104 |

Complaint for violation of Title 18, United States Code, Section 922(a)(1)(A)

| NAME OF MAGISTRATE JUDGE<br>THE HONORABLE ROZELLA A. OLIVER | UNITED STATES MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|
| DATE OF OFFENSE<br>April 16, 2019 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN)<br><br>FILED CLERK, U.S. DISTRICT COURT<br>MAY 20 2019<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY ___ DEPUTY |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[18 U.S.C. §922(a)(1)(A)]

Beginning on or about September 19, 2018, and continuing through on or about April 16, 2019, defendant PEDRO CORTES, not being licensed as an importer, manufacturer, or dealer of firearms, willfully engaged in the business of dealing in firearms.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>**JASON MALIK**<br>OFFICIAL TITLE<br>Task Force Officer – ATF |
|---|---|

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) | DATE @ 1 p.m.<br>May 20, 2019 |
|---|---|

(1) See Federal Rules of Criminal Procedure 3 and 54

AUSA Roger A. Hsieh x0600    REC: Detention

## AFFIDAVIT

I, Jason Malik, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant against Pedro CORTES ("CORTES") for a violation of 18 U.S.C. § 922(a)(1)(A) (Selling Firearms without a License).

2. This affidavit is also made in support of an application for a warrant to search 1540 E. 49th St, Los Angeles, California, 90011 (the "SUBJECT PREMISES") as described more fully in Attachment A-1, and the person of CORTES as described more fully in Attachment A-2.

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 922(a)(1)(A) (Selling Firearms without a License), (the "Subject Offense"), as described more fully in Attachment B. Attachments A-1, A-2, and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations; my training and experience; and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all

conversations and statements described in this affidavit are related in substance and part only.

## II. BACKGROUND OF ATF TASK FORCE OFFICER JASON MALIK

5.  I am a sworn Task Force Officer, ("TFO"), with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), currently assigned to the Los Angeles Field Division, Group II/Los Angeles Police Department ("LAPD"), Metropolitan Division Task Force.  I have been a peace officer with the LAPD for over 21 years.  My mission within this task force includes reducing gang-related and violent crime; assisting in the investigation, identification, location, and apprehension of persons that have committed crimes within the City of Los Angeles or against the United States; and using proactive methods to monitor and prevent criminal activity.  I have been assigned to this task force for approximately 3 years.

6.  I received seven months of basic law enforcement training while attending the Los Angeles Police Academy.  I have also received specialized training in drugs and firearms.  During my time as a peace officer, I have conducted surveillance operations at known drugs, gang, and illegal firearm sales locations and observed the actions and methods used by criminal street offenders in the course of buying and selling contraband. I have also conducted hundreds of firearm-related investigations.

## III. SUMMARY OF PROBABLE CAUSE

On or about September 19, 2018, October 10, 2018, and April 16, 2019, CORTES sold an ATF Confidential Informant

2

("CI") three firearms and ammunition during three separate controlled purchases. CORTES does not have a Federal Firearms License. CORTES told the CI that the SUBJECT PREMISES is his residence and had the CI meet him at the SUBJECT PREMISES for the April 16, 2019, firearm sale. California Department of Motor Vehicle ("DMV") and criminal history records also show that CORTES resides at the SUBJECT PREMISES.

## IV. STATEMENT OF PROBABLE CAUSE

7. Based on my review of recorded audio/video surveillance, talking with other law enforcement officers, as well as my own observations and knowledge of the investigation, I am aware of the following:

**A. Controlled CI Purchase from CORTES on September 19, 2018**

8. On or about September 19, 2018, an ATF Confidential Informant ("CI")[1] contacted me about an individual named "Bernie" willing to sell firearms. The CI stated that "Bernie" would be able to sell two semi-automatic handguns for $1,700 that evening at a location near S. Central Avenue and 47th Street in Los Angeles.

9. On the same day, ATF Special Agent ("SA") Davis outfitted the CI with an electronic transmitter device and a camera-recording device. Law enforcement provided the CI with

---

[1] The CI in this case is not currently facing any criminal charges and does not have any criminal convictions. As a result of the CI's cooperation with the ATF, state prosecutors declined to prosecute the CI in 2018 for misdemeanor possession of a controlled substance. The CI has earned approximately $8,000 in exchange for one year of work done on behalf of the ATF, not limited to the instant matter.

3

$1,700 in cash to complete the transaction with "Bernie." SA Davis instructed the CI to meet "Bernie" around the intersection of E. Slauson Avenue and S. Central Avenue in Los Angeles, either at McDonald's or CVS. The CI drove his/her personal car to meet "Bernie," and SA Davis followed the CI.

10. At approximately 6:45 p.m. that evening, the CI parked at a CVS located at 5837 S. Central Avenue. After parking at the CVS, the CI made contact with "Bernie" over the telephone to inform him of his/her arrival at the meeting location. "Bernie" eventually informed the CI that he was delayed because he had to drive a long distance to obtain the firearms.

11. At approximately 9:00 p.m., "Bernie" called the CI and instructed him/her to meet him at the McDonald's located across the street from the CVS parking lot. The surveillance team then saw a white 1999 Toyota Solara with California License Plate 6DSK987 (the "Toyota") pull into the McDonald's parking lot. Law enforcement saw a Hispanic male, later identified as CORTES, exit the Toyota and conduct a transaction with the CI. Afterwards, the Toyota left the McDonald's parking lot, and the surveillance team followed the CI back to a predetermined debriefing location.

12. At the debriefing location, SA Davis recovered an Arcadia Machine & Tool model .380/9mm Kurz semi-automatic pistol bearing serial number 74677 from the CI. The CI stated he/she received the semi-automatic pistol from "Bernie" in exchange for $900. During the debrief, the CI stated that "Bernie" was wearing automotive technician clothing and that "Bernie" works at

South Central Auto Repair Inc., 4625 S. Central Ave. Los Angeles, CA 90011.

13. The CI told law enforcement that "Bernie" stated he lives at the SUBJECT PREMISES. DMV records show that the Toyota was registered to Pedro David CORTES-SALAS at the SUBJECT PREMISES, registration valid until September 14, 2018. The registration for the Toyota expired in September 2018 but was last registered to CORTES at the SUBJECT PREMISES. The CI identified "Bernie" as CORTES when shown a booking photo of CORTES. SA Davis reviewed the recorded camera footage of the transaction between the CI and CORTES. The camera's battery, however, ran out due to CORTES's delay in obtaining the firearms and the actual exchange was not recorded.

14. Prior to departing the staging location and at the conclusion of the operation, SA Davis searched the CI and the CI's car for contraband. Besides the firearms purchased from CORTES, SA Davis did not locate any contraband on the CI or in his/her car.

 B. **Controlled CI Purchase from CORTES on October 10, 2018**

15. On or about October 9, 2018, the CI advised me that CORTES wanted to sell him/her two firearms, an AK-47 rifle and a handgun.

16. On October 10, 2018, I equipped the CI with an electronic audio/video recording device and an electronic wire transmitter. I also provided the CI with $1,900 in cash to purchase the firearms from CORTES. I and other law enforcement

officers visually and electronically monitored the CI during the operation.

17. The same day, the CI traveled from a staging location to the Jack in the Box restaurant parking lot located at 4407 S. Central Ave, Los Angeles, California 90011. Upon arrival, the CI contacted CORTES via cell phone and told him that he/she was in the parking lot. CORTES told the CI that he could not leave work and instructed the CI to come to his place of business. The CI then traveled from the Jack in the Box to the Smog Shop located at 4625 S. Central Ave, Los Angeles, California, 90011.

18. Upon arrival to the Smog Shop, the CI pulled his/her car into the driveway area. CORTES approached the CI's car and entered the passenger's side. CORTES told the CI that he did not have the AK-47 and only had a handgun for sale. The CI then provided CORTES with $600. Next, surveillance units saw CORTES exit the CI's car, obtain a yellow box, and then reenter the passenger seat of the CI's car. CORTES then gave the CI the yellow box. The yellow box contained a handgun inside a black sock. After a brief conversation between the CI and CORTES, CORTES exited the car, and then the CI left the Smog Shop and returned to the staging location. Surveillance units were able to identify CORTES as the individual who provided the CI with the yellow box.

19. At the staging location, I recovered one Smith and Wesson, model 59 handgun, bearing serial number A695200 from the CI's car, a yellow "Animal Cracker Box," and a black sock.

20. During the transaction, and due to the CI who stayed seated in the CI's vehicle, CORTES' image was not captured on the video recording device. However, CORTES' voice and conversation with the CI was captured.

21. Prior to departing the staging location and at the conclusion of the operation, I searched the CI and the CI's car for contraband with LAPD Officer Lopez. Besides the firearms purchased from CORTES, we did not locate any contraband on the CI or in his/her car.

### C. Controlled CI Purchase from CORTES April 16, 2019, at the SUBJECT PREMISES

22. On or about April 14, 2019, the CI advised me that CORTES wanted to sell him/her a .40 caliber handgun with an extended magazine for $800.00. The CI also advised me that CORTES stated the handgun was located at the SUBJECT PREMISES.

23. Prior to the sale, law enforcement equipped the CI with an electronic audio/video recording device and an electronic wire transmitter. In addition, ATF SA Arellano provided the CI with $800.00 so that the CI could to purchase the aforementioned firearm from CORTES. I and other law enforcement officers visually and electronically monitored the CI during the operation.

24. From a staging location, the CI drove to CORTES's home residence, the SUBJECT PREMISES.[2] The CI parked in front of the SUBJECT PREMISES. Law enforcement saw CORTES walk from the front

---

[2] My review of the Consolidated Criminal History System shows that the SUBJECT PREMISES is CORTES's home address.

7

of the SUBJECT PREMISES and enter the CI's car through the front passenger door. Based on my conversation with the CI and review of recorded video/audio, I understand that while seated inside the car, CORTES handed the CI a handgun. CORTES told the CI that he could get additional firearms for the CI in the future. The CI then provided CORTES the agreed $800 for the handgun. CORTES then exited the CI's car, and law enforcement saw CORTES walk back to the front of the SUBJECT PREMISES.

25. The CI then left the SUBJECT PREMISES and returned to the staging location. At the staging location, I recovered one Ruger, model P94, handgun, bearing serial number 340-91256, fifteen rounds of .40 caliber ammunition, and one 30-round capacity magazine from the CI's car.

26. Later that day, the CI provided me with several text messages between CORTES and the CI in which CORTES solicited additional sales of firearms to the CI.

27. During this transaction, the recording device captured both video and audio recordings of CORTES in the car with the CI. The video also captures CORTES giving a firearm to the CI while CORTES is still seated in the CI's car.

28. Prior to departing the staging location and at the conclusion of the operation, I searched the CI and the CI's car for contraband with ATF SA Gonzalez. Besides the firearm purchased from CORTES, we did not locate any contraband on the CI or in his/her car.

D.     **CORTES Does Not Have a License as a Firearms Dealer**

29.  On or about April 15, 2019, ATF Industry Operations Investigator, Derek Smith searched law enforcement databases and did not see any record that CORTES has or has ever had a Federal Firearms License.  I understand that in order to legally be able to sell firearms, an individual must have a Federal Firearms License.  From my training and experience, if an individual has or had a Federal Firearms License, the law enforcement database would show the existence of that license.

V.   **TRAINING AND EXPERIENCE ON FIREARMS OFFENSES**

30.  From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

a.     Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices.  It has been my experience that prohibited individuals who own and deal firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices.

b.     Many people also keep mementos of their firearms, including digital photographs or recordings of themselves

9

possessing or using firearms on their digital devices, or of firearms that they wish to sell to others. These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

   c. Correspondence between persons buying and selling firearms, including correspondence between co-conspirators in the dealing of firearms without a license, often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices. This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price. In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

   d. Individuals engaged in the illegal purchase or sale of firearms often use multiple digital devices.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[3]

31. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

    b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been

---

[3] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

    c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

    d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

32. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data

during a search of the premises for a number of reasons, including the following:

    a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

    b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

33. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

    a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device

13

enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

      b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

34. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress CORTES's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of CORTES's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

35. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

36. For all of the reasons described above, there is probable cause to believe that CORTES has committed a violation of 18 U.S.C. § 922(a)(1)(A): Dealing Firearms without a License There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT PREMISES described in Attachment A-1 and the person of CORTES described in Attachment A-2.

_____
Jason Malik,
ATF Task Force Officer

Subscribed to and sworn before me
this 20th day of May, 2019.

_____
UNITED STATES MAGISTRATE JUDGE